UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | | |
|---|---|---|---|
| TERESA A. FLORES, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | No. 4:13CV611SNLJ | |
| | ) | (TIA) | |
| CAROLYN W. COLVIN, | ) | | |
| Acting Commissioner of Social Security, | ) | | |
| | ) | | |
| Defendant. | ) | | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration. The suit involves an Application for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act. Claimant has filed a Brief in Support of her Complaint; the Commissioner has filed a Brief in Support of her Answer. The case was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b).

**I.     Procedural History**

On March 22, 2005, Claimant Teresa A. Flores filed an Application for a Period of Disability and Disability Insurance Benefits under Title II of the Act, 42 U.S.C. §§ 401 et. seq. (Tr. 15, 910-14)[1] alleging disability since June 30, 2004 due to left shoulder pain, muscle spasms, and knots in shoulder blade. (Tr. 959, 964). The application was denied, and Claimant subsequently requested a hearing before an Administrative Law Judge (ALJ), which was held on November 16, 2006. (Tr. 31). In a decision dated April 17, 2007, the ALJ issued a partially

---

[1]"Tr." refers to the page of the administrative record filed by Defendant with its Answer. (Docket No. 10/filed June 7, 2013).

favorable decision denying her claim for benefits from her alleged onset date of June 30, 2004 until October 19, 2006 and awarding benefits beginning on October 19, 2006. (Tr. 28-40). A request for Review was filed with the Appeals Council. (Tr. 45-46). On July 15, 2009, the Appeals Council remanded the case to the ALJ to reevaluate Claimant's residual functional capacity and functional limitations, evaluate her complaints of pain, determine her functional limitations or residual functional capacity during the entire period at issue, and obtain evidence from a vocational expert to clarify the effect of the assessed limitations on her occupational base. (Tr. 41-44).

Claimant subsequently requested a hearing before an Administrative Law Judge (ALJ), which was held on April 27, 2010. (Tr. 804-32). Vocational Expert Delores Gonzalez also testified at the hearing. (Tr. 827-31). Thereafter, on March 11, 2011, the ALJ issued a partially favorable decision on Claimant's claims for benefits finding she met the requirements for disability on April 6, 2007, but not prior to that date. (Tr. 12-27). After considering the representative's brief, the Appeals Council on January 30, 2013 found no basis for changing the ALJ's decision and denied Claimant's request for review of the ALJ's decision. (Tr. 5-9, 833-35). The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.     Evidence Before the ALJ

### A.  Hearing on April 27, 2010

#### 1.  Claimant's Testimony

At the hearing on April 27, 2010, Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 804-32). Claimant's date of birth is March 3, 1961. (Tr. 808). She is

forty-nine years old at the hearing. (Tr. 808). She graduated from high school. (Tr. 821). Claimant last worked on June 30, 2004 after moving from Belle, Missouri to Walton, Kentucky. (Tr. 809). She moved back to Missouri on September 29, 2005 to be closer to her sick mother. (Tr. 810). Claimant can drive a short distance. (Tr. 815).

Prior to June 30, 2004, Claimant testified that she was taking Vicodin 750 milligrams, eight Percocets a day, and six Flexeril a day. (Tr. 809). In 2004 after moving to Kentucky, she was taking Aleve, Tylenol, and Vicodin given to her in the emergency room. (Tr. 809). In July 2004, her neck had a lot of nerve damage. (Tr. 810). Claimant testified that her neck condition and pain were consistent until October 19, 2006 when she had the second surgery. (Tr. 810).

Claimant testified that she could not work after June 30, 2004, because she could no longer torture herself by standing or lifting. (Tr. 810). She also was having headaches, pain and a burning sensation down her lower back, and a knot under shoulder. (Tr. 811). Dr. Umbright recommended surgery in August 2004. Claimant testified that Dr. Vitols recommended surgery in November 2004 but the insurance companies declined. In July 2005, Claimant was taking eight Vicodins, 750 milligrams, each day. Claimant testified that her pain medicine remained consistent from July 2005 to July 2006. (Tr. 811).

In April 2007, Dr. Snyder performed left shoulder surgery and placed her on fentanyl patches. (Tr. 812, 822). Dr. Snyder never returned Claimant to work. (Tr. 822). Claimant changed to 1,000 milligram Percocets and 300 milligrams of Tylenol three times a day. (Tr. 812). The Percocets make her drowsy, and she has to lie down quite a bit throughout the day, and she sleeps a couple of hours during the day. (Tr. 815). Claimant also takes Valium twice a day to relax the muscles in her back and neck. (Tr. 813).

Claimant testified that she was not able to return to work in April 2007, because she cannot lift her arm or grip with three fingers on her left hand and her pain. (Tr. 814). Since the October 2006 neck surgery, she experiences headaches and burning sensations. (Tr. 814). After carpal tunnel surgery on her left wrist, Claimant testified physical therapy did not help. (Tr. 816). Claimant testified that her current doctor, Dr. Bohlmann, told her there is nothing that can be done for her. (Tr. 815).

Claimant testified that she could not sit at a desk for eight hours a day answering a telephone, because sitting for any amount of time bothers her. (Tr. 821). After sitting for a little bit, she has to get up and walk around or lie down. (Tr. 821).

Claimant filed a prior claim in Ohio for Social Security disability in July 2004, and this claim was denied. (Tr. 823).

In 1995, Claimant worked for three years at Express Services as a bindery worker making, boxing, and drilling books. (Tr. 823). Her job required Claimant to lift approximately twenty-five pounds. (Tr. 824). At Quaker Windows, she made windows. At Casey's, Claimant worked as a convenience store clerk and a cook. In 2003-2004, she worked as a grill cook at Mr. GS Deli. (Tr. 824).

The injury she sustained at Quaker Windows supporting the workers' compensation claims occurred in January 1999. (Tr. 825). Her three workers' compensation claims were for her wrist, neck, and shoulder. (Tr. 826-27). Claimant's claims were pending while she worked at Casey's and Mr. GS Deli. She stopped working, because she could no longer lift the chicken or run the meat slicer. (Tr. 825). Claimant testified that she worked at Mr. GS Deli until she moved to Ohio, and she has not looked for work since leaving Mr. GS Deli. (Tr. 826).

- 4 -

## 2. Testimony of Vocational Expert

Vocational Expert Delores Gonzalez testified in response to the ALJ's questions. (Tr. 827-31).

The ALJ asked Dr. Gonzalez to assume that

a hypothetical claimant age 43 at the alleged date of onset, with 12 years of education, the same past work experience. In the first one it's been opined that his hypothetical claimant can lift and carry less than 10 pounds both occasionally and frequently, and should avoid repetitive bending and twisting of the neck and left shoulder. Reaching in all directions is limited to no repetitious on the left, reaching overhead is limited to more than occasional on the left, and handling, gross manipulation is limited to no repetitious on the left. In addition, this hypothetical claimant should avoid moderate exposure to extreme cold and extreme heat and avoid exposure to hazards and unprotected heights, moving and dangerous machinery, and vibration. And it's been indicated by the testimony the left is the dominant hand. Given those restrictions, and those alone, could this hypothetical claimant return to any past relevant work?

(Tr. 827-28). Dr. Gonzalez opined that such an individual could not perform any past relevant work, but she could perform other work such as a surveillance monitor, a sedentary and unskilled job with 85,440 jobs available nationally and 2,020 locally; and a call-out operator, a sedentary and unskilled job with 67,400 jobs available nationally and 1,190 available locally. (Tr. 828).

Next, the ALJ asked Dr. Gonzalez to assume the additional information:

It's 10 pounds occasionally, less than 10 pounds frequently. There are no restrictions on standing, walking or sitting, should never climb ropes, ladders, and scaffolds. Reaching in all directions is limited to no repetitious on the left. Reaching overhead is no more than occasional on the left. Should avoid concentrated exposure to extreme cold, hazards of unprotected heights, vibration, and moving and dangerous machinery. Would those restrictions allow for return to any past relevant work?

(Tr. 829). Dr. Gonzalez opined no, and the jobs cited from the last hypothetical would be applicable. (Tr. 829).

Lastly, the ALJ asked as follows:

> the same as hypothetical number two, except that it allows for 20 pounds occasionally and 10 pounds frequently as far as lifting and carrying. If that were the case, would that allow for a return to any of the past relevant work?

(Tr. 829). Dr. Gonzalez responded no. Dr. Gonzalez explained Claimant's past work as a convenience store work and the bindery work were considered light work, but both jobs required more than occasional use of the left arm so she could not perform the jobs. (Tr. 829-30).

Counsel asked if the weight restrictions in the ALJ's hypotheticals was reduced to five pounds, would that change her opinion. (Tr. 830). Dr. Gonzalez explained that an individual needs to be able to lift 10 pounds in order to do sedentary work, but there are many jobs that only require a person to lift 5 pounds or less such as a surveillance system monitor. (Tr. 830-31). Next, counsel if the individual "has to lay[*sic*] down at least twice a day for a period of two hours a day each time, and going to sleep, would that change your opinion about any of the jobs?" (Tr. 831). Dr. Gonzalez noted if the person needs to lie down for rest periods at will during the day such person would need to be accommodated and therefore not be able to perform competitive employment. (Tr. 831).

The ALJ stated he would keep the record open for thirty days so that counsel could submit the additional medical records from Dr. Bohlmann. (Tr. 831).

## III.    Medical Records [2]

Dr. Michael Dudenhoeffer completed an EMG to the left upper extremity to rule out radiculopathy. (Tr. 977, 1030). Examination showed marked spasm in the left upper back

---

[2]Inasmuch as Claimant has been found to be disabled as of April 6, 2007, and she is not appealing that part of the decision, the undersigned will not summarize the medical records from after that date because the relevant time period ends on April 5, 2007.

muscles at the upper trapezius and levator scapula muscle origin as well as into the rhomboids. Dr. Dudenhoeffer noted probable trigger point with some radiation into the arm. (Tr. 977, 1030). Dr. Dudenhoeffer found Claimant has myofascial pain in trigger points of the left upper back with referred symptoms into the upper extremity. (Tr. 978). Dr. Dudenhoeffer suggested physical therapy as treatment and considered possible trigger point injection and adding muscle relaxant. (Tr. 978). The October 21, 1998 cervical spine MRI showed mild right paracentral disc bulge at C5-C6 which does not produce significant spinal stenosis or neural foraminal encroachment. (Tr. 431, 476, 679, 976, 1016).

On December 7 and 27, 1999, Dianna Adkison, D.O., administered cervical epidural steroid injections. (Tr. 1035-54). Claimant reported undergoing electrotherapy and physical therapy and having been on several oral medications including Darvocet and Flexeril without significant relief of her pain. (Tr. 1035). The October 21, 1998 MRI showed a mild right paracentral disc bulge at C5-6. (Tr. 1036). Dr. Adkison found Claimant has chronic cervical pain with upper extremity radiculopathy probably secondary to disc disease and tobacco abuse. (Tr. 1036).

In the January 31, 2000 letter, Dr. John Lucio updated Dr. Dudenhoeffer about Claimant undergoing two cervical epidural steroid injections, but noted she has not responded adequately and the prescribed pain killers and muscle relaxers have not provided any appreciable long-term relief. (Tr. 438, 576, 970). Dr. Lucio determined he could not offer Claimant any further relief and suggested a surgical consultation. (Tr. 438-61, 970).

On February 4, 2000, Dr. Curtis Cox diagnosed Claimant with neck and bilateral arm pain and noted her symptoms suggested peripheral entrapment neuropathy as well as pinched

nerves in her neck.  (Tr. 578, 618, 654, 980, 1085A-1086).  Dr. Cox noted the MRI showed mild

right paracentral disc bulge at C5-6.  (Tr. 579, 619, 655, 979).  Claimant smokes a package of

cigarettes every day.  (Tr. 579, 655, 979).

In the February 11, 2000 emergency room treatment note, the doctor noted how Claimant

has been "on narcotics pretty much daily around the clock for the last two years in the form of

Darvocet" and has been recently discontinued off the medication by her doctor.  (Tr. 685, 1368).

The doctor suspected narcotic withdrawal syndrome. (Tr. 686, 1369).

The February 14, 2000 MRI of her cervical spine showed mild disc bulging C5-C6.  (Tr.

515, 620, 653, 678A, 1055, 1060, 1087).  Dr. Cox recommended anterior cervical discectomy

and interbody fusion at C5-6 as a last resort but he recommended left carpal tunnel release since

this is where most of her symptoms are and may provide relief in her neck and shoulder.  (Tr.

621-22, 649, 1061, 1085).

On February 15, 2000, Dr. Ahmad Hooshmand performed nerve conduction and EMG

testing and reported to Dr. Cox the results showing more consistent with moderately advanced

bilateral carpal tunnel syndrome, slightly more severe in the left side.  (Tr. 683-84, 1058-59).

On March 3, 2000, Dr. Curtis Cox performed left carpal tunnel release surgery, (Tr.

368-92, 623-24, 667-69, 1062-64, 1083-1084, 1348-65).  In follow-up treatment on March 17,

2000, she reported the release has helped her.  (Tr. 625, 646. 1066, 1082).  On March 30, 2001,

Dr. Cox treated her for head and neck pain.  (Tr. 1069).

On July 12, 2000, Claimant received treatment after slipping on a concrete step in rainy

weather two weeks earlier at work and injuring her hip and left arm.  (Tr. 1081).

On October 9, 2000, Dr. Richard Daugherty evaluated Claimant's neck pain and muscle

spasms along the trapezius and sternocleidomastoid area. (Tr. 1080). Examination showed some muscle spasm along the sternocleidomastoid and the trapezius muscle area bilaterally and decreased range of motion in left shoulder, anterior and laterally, all the way to approximately 90 degrees. Dr. Daugherty diagnosed Claimant with chronic neck pain secondary to herniated disc and prescribed Celebrex and restricted her lifting to no more than ten pounds, no repetitive bending, twisting, or turning and avoid smoke environments, and he encouraged her to stop smoking completely. (Tr. 1080).

On November 20, 2000, a nurse practitioner at St. Mary's Belle Clinic evaluated her neck pain and muscle spasms. (Tr. 1078). The nurse noted how Dr. Daugherty had provided her samples of Celebrex, and this seemed to significantly improve her pain, but then she did not return for her follow-up appointment. (Tr. 1078). The nurse noted how Claimant reported bulging cervical disc at C6, and the nurse recommended exercises and prescribed medications. (Tr. 1079).

On December 11, 2000, Claimant returned to St. Mary's Ambulatory Care Clinic for a recheck on her left arm pain and no improvement on Vioxx. (Tr. 1076). Her headaches caused by muscle spasm in her neck to be significantly improved on Fioricet intermittently and Flexeril. She has a history of C5-C6 disc herniation but she has not been evaluated for some time. Dr. Daugherty found Claimant to have left arm paresthesias and ruled out disc herniation with radiculopathy. (Tr. 1076). Dr. Daugherty ordered an x-ray and directed her to avoid any severe heavy lifting or repetitive activities. (Tr. 1077).

On March 21, 2001, Dr. Daugherty evaluated Claimant's neck pain and muscle spasms. (Tr. 1075). Musculoskeletal examination showed moderate amount of spasm along the cervical

musculature, and some spasm along the thoracic musculature and trapezius area and decreased range of motion in her neck.  Dr. Daugherty diagnosed Claimant with cervical strain with history of bulging disc/herniation and radiculopathy which was acutely worsening.  Dr. Daugherty recommended having another MRI and possible surgical intervention by Dr. Cox.  Dr. Daugherty noted she could not drive or operate machinery while taking secondary to sedation, and no lifting greater than five pounds of upper extremities, no repetitive bending, twisting, or turning motions of the thoracic or cervical areas.  (Tr. 1075).

The March 27, 2001MRI of her cervical spine showed mild disc bulging and a small right foraminal disc protrusion at C5-C6.  (Tr. 511, 626, 678, 1056).

On March 30, 2001, Dr. Cox treated Claimant's head and neck pain.  (Tr. 1069).  She reported a history of herniated and bulging disc in her cervical area and having an appointment with a neurosurgeon the following week.  Dr. Cox prescribed Toridol and Percocet. (Tr. 1069).

On April 30, 2001, Dr. Cox diagnosed Claimant with hypertrophic cervical spondylosis with herniated disc at 5-6 with radiculpathy and determined to perform anterior cervical diskectomy and interbody fusion with internal stabilization at 5-6.  (Tr. 627, 640, 1074).

On June 6, 2001, Cr. Cox performed anterior cervical discectomy, osteophytectomy with interbody fusion using an ACF wedge at C5-C6, and internal stabilization with a Synthes plate. (Tr. 311-32, 335-62, 659-65, 1070-73, 1156-62, 1283-1333).  Cervical disc displacement is listed as her clinical diagnosis.  (Tr. 330).  A pathology report confirmed the presence of degenerative changes.  (Tr. 330).  Herniated disk with cervical spondylosis, neck and radicular pain are listed as her discharge diagnosis.  (Tr. 332).  The June 22, 2001 radiology report of her cervical spine demonstrated fusion and plating of the C5 and C6 vertebral bodies.  (Tr. 363-67,

1338).

On July 24, 2001, Dr. Cox noted that the fusion at C5-6 appeared to be progressing nicely and recommended a nerve conduction velocity study of her left upper extremity. (Tr. 629, 671, 1176, 1281).

On August 7, 2001, Dr. Thomas Folz treated Claimant for left upper extremity pain - etiology uncertain. (Tr. 588-89, 608-09, 680-82, 990-91). The August 10, 2001 nerve conduction studies showed normal in the left upper extremity. (Tr. 599-601, 996-98). The electrodiagnostic studies performed on her left upper extremity showed normal findings. (Tr. 989). Examination showed tenderness to palpation in the left scapula and upper trapezius regions and some abnormal increased muscle tension. Dr. Folz found Claimant has myofascial pain and decided to use manual medicine to reduce the abnormal muscle tension. (Tr. 989).

On August 9, 2004, Dr. Alan Umbright completed a disability evaluation requested by Claimant's counsel. (Tr. 836, 981). She reported not working since mid 2001. (Tr. 836, 981). She complained of constant achiness and stiffness of her left shoulder and marked decreased range of motion and occasional tightness of spasm in the lateral neck muscles. Dr. Umbright noted a review of her medical records shows Claimant takes Extra-Strength Tylenol several times a day. Examination showed Claimant lacked 30 degrees of full rotation to the left side, and backward extension decreased by 10 degrees. Examination of her left shoulder revealed marked decreased range of motion and backward rotation, and a positive impingement test on internal rotation at 90 degrees. (Tr. 837, 982). Dr. Umbright opined that Claimant "developed significant overuse disorders of both upper extremities from her work as an insert puncher at Quaker Window Products." (Tr. 838, 983). In his medical opinion, Claimant had a 35%

permanent partial impairment at the level of the left wrist from her left carpal tunnel disease and subsequent surgery with decreased strength and decreased range of motion; she had a 20% permanent impairment at the level of the right wrist secondary to her right carpal tunnel disease; an additional 25% disability of the person as a whole from her cervical laminectomy resulting in decreased range of motion and pain in the base of the left neck and shoulder; and a 50% permanent partial impairment at the level of the left shoulder, secondary to her significant impingement syndrome and underlying rotator cuff tendinitis.  (Tr. 838, 983).

On August 15, 2004, Dr. Folz treated her myofascial pain by applying heat packs.  (Tr. 988).  She reported feeling a little better and relaxed with less pain.  (Tr.988).  On August 16 17, Dr. Folz applied heat packs as treatment, (Tr. 886-87).  In follow-up treatment for her myofascial pain, Dr. Folz applied heat packs and provided exercises.  (Tr. 985).  Claimant reported feeling less pain and discomfort after treatment.  (Tr. 985).

Claimant reported having severe muscle spasms in her back in the emergency room on September 1, 2004.  (Tr. 740-42, 849, 1009).  Dr. David Cohen diagnosed acute lumbosacral thoracic spasming and muscle pain and provided Vicodin, Motrin, and Flexeril.  (Tr. 743, 849, 1010).

On November 11, 2004, Dr. Cohen treated Claimant in the emergency room for pain in her left shoulder.  (Tr. 731, 847, 1007).  Examination showed pain with abduction and internal and external rotation.  (Tr. 732, 848, 1008).  Dr. Cohen diagnosed Claimant with acute exacerbation of left shoulder strain and provided Vicodin, Motrin, and Flexeril to take as directed and a sling.  (Tr. 732, 848).

At the request of counsel, Dr. Aivars Vitols, an orthopedic surgeon, evaluated Claimant

on November 15, 2004. (Tr. 136, 1002). She reported a history of shoulder and neck problems caused by a work-related injury starting in January 1999. Claimant experiences pain and burning sensation in her left shoulder, and the pain is exacerbated by any attempts to raise her arm. (Tr. 136, 1002). Her current medications include Vicodin and Flexeril. (Tr. 137, 1001). She smokes one pack of cigarettes a day. Examination showed she has a reduced range of motion and reduced strength in her left shoulder. Dr. Vitols observed Claimant to experience pain and discomfort during the examination and noted that she is able to grasp and manipulate with both hands satisfactorily. Dr. Vitols found that the clinical examination is consistent with shoulder pathology. Dr. Vitols concluded that '[b]ased on this historical presentation as presented by the claimant, it is a result of an overuse syndrome from 1999. As a result she has developed impingement factors within the left shoulder." (Tr. 137, 1001). Dr. Vitols noted that physical therapy has failed to provide relief and opined he would consider administering a series of Cortisone injections but Claimant had advised him she would not consider any Cortisone injections. Thus, Dr. Vitols noted his next course of treatment would be to proceed with arthroscopic surgery to the left shoulder with a probable decompression of the subacromial space. (Tr. 137, 1001).

On March 18, 2005, Claimant sought treatment for left shoulder pain in the emergency room. (Tr. 749, 757, 845, 1005). Examination showed tenderness in her left shoulder and grinding in the shoulder external and internal rotation. (Tr. 758, 846). Dr. Cohen diagnosed acute and chronic shoulder strain and prescribed Vicodin and Motrin. (Tr. 755, 758, 846, 1005). Dr. Cohen explained to Claimant why she needs to get a primary doctor and cannot keep coming back to the emergency room for chronic pain medications and referred her to Family Health

- 13 -

Center.  (Tr. 758, 1006).

In the Physical Residual Functional Capacity Assessment dated May 20, 2005, Dr. William Caldwell listed left shoulder impingement as Claimant's primary diagnosis, and DDD cervical spine, CTS, and back spasms as her secondary diagnosis.  (Tr. 924, 932).  Dr. Caldwell indicated that Claimant can occasionally lift twenty pounds, frequently lift ten pounds, and stand and walk about six hours in an eight-hour workday.  (Tr. 925, 933).  Dr. Caldwell noted that Claimant can sit about six hours in an eight-hour workday and has limited capacity to push and/or pull.  (Tr. 925, 933).  With respect to postural limitations, Dr. Caldwell noted she can occasionally crawl but never climb ladders. (Tr. 926, 934).    The doctor indicated that Claimant is limited in her ability to reach in all directions including overhead, and she should avoid reaching with her left arm.  (Tr. 927, 935).  Dr. Caldwell found she has no established communicative or environmental limitations.  (Tr. 928, 936).   Dr. Caldwell found her pain to be attributable to a diagnosed medical impairment, but her allegations of near total loss of use of her upper extremity is not supported.  (Tr. 929, 937).

In the December 12, 2005, St. Mary's Clinic note, Claimant reported having her last physical examination four weeks earlier and presenting to reestablish care.  (Tr. 147, 195, 1138).  She explained how she has not been seen anywhere except in the emergency room due to lack of insurance.  (Tr. 195).  She has significant left shoulder pain and has had repetitive strain injury in the shoulder, but she has been unable to obtain care due to no insurance.  Claimant deferred any evaluation until she is able to obtain insurance.  (Tr. 195, 1138).

During an office visit on March 9, 2006, Claimant requested a prescription refill of Vicodin to last until April 16 when she is having shoulder surgery.  (Tr. 160).

Claimant returned to Dr. Umbright for further evaluation on March 13, 2006 at counsel's request. (Tr. 840, 1092). Dr. Umbright noted no improvement in her left shoulder symptoms from her impingement, and she has had no further treatment of her left shoulder. Examination showed increased impingement and tendinitis in the left shoulder. Dr. Umbright suggested she receive additional treatment for her left shoulder including MRI, injection, and physical therapy and then surgery if the conservative treatment does not improve her symptoms. (Tr. 840, 1092).

On several dates between July 6 and December 11, 2006, Dr. Daugherty provided medications and noted she should not operate/drive machinery secondary to sedation/dizziness. (Tr. 1113-16, 1121, 1126, 1131, 1133).

On June 28, 2006, she reported chronic left shoulder pain over the last three years, and pain has worsened with repetitive use of her arm at work. (Tr. 192, 1134). Examination showed tenderness throughout to palpation over the left rotator cuff and decreased range of motion. (Tr. 192, 1134). Claimant requested a MRI now that she has insurance. (Tr. 194). Dr. Daugherty ordered a MRI and prescribed Norco for her severe pain. (Tr. 193, 1135). Dr. Daugherty encouraged her to stop smoking, but Claimant is not ready to do so. (Tr. 193, 1135).

On June 28, 2006, Claimant returned to the St. Mary's Clinic and reported sometimes taking pain medications. (Tr. 154).

The July 5, 2006 MRI of her left shoulder showed partial intrasubstance tear or the insertion of the supraspinatus tendon. (Tr. 201, 304, 1153, 1276).

During treatment by Dr. Daugherty on July 28, 2006, Claimant reported not liking the orthopedist she saw, because he told her the same things she had been told ten years earlier. (Tr. 188)

On August 14, 2006, Claimant returned for reevaluation of left shoulder pain/partial tear and reported chronic pain rated at 7/10. (Tr. 185, 1127). She noted no improvement with range of motion exercise and conservative treatment. After seeing Dr. Craighead, an orthopedist, he scheduled treatment with Dr. Rodgers, a spine specialist. Examination showed decreased range of motion of the left shoulder and unable to elevate the arm greater than ninety degrees anteriorly or laterally. Dr. Daugherty provided range of motion exercises and refilled Norco prescription. (Tr. 185, 1127).

Claimant returned for follow-up treatment on October 3, 2006, for left shoulder and neck pain issues. (Tr. 180, 1122). She reported her pain being pretty well controlled of the left shoulder and neck area with Norco one to two tablets every six hours. Pain is exacerbated with certain movements of the shoulder and neck region. She reported not being able to see her orthopedist or spine specialist due to insurance issues. Examination showed limitation of the neck with lateral rotation to approximately sixty degrees bilaterally and flexion pretty well intact. (Tr. 180, 1122). Dr. Daugherty limited her left arm lifting and noted he would try to reschedule with Dr. Galbraith. (Tr. 181, 1123).

On October 19, 2006, Dr. William Rodgers evaluated her degenerative disc disease on referral by Dr. Daugherty. (Tr. 206, 541, 551, 1141, 1171). Examination showed normal muscle strength and tone in her left arm, but decreased grip strength and sensation. (Tr. 208, 543, 553, 1147, 1173). Claimant experienced pain when moving her neck, and the cervical spine x-rays showed significant degenerative changes. (Tr. 207-08, 542-43, 552-53, 1146-47, 1172-73). Dr. Rodgers discussed the option including physical therapy, epidural steroid injections, and surgery and the need for a new MRI. (Tr. 209, 544, 554, 1148, 1174). Dr. Rodgers performed a anterior

cervical diskectomy and fusion on November 6, 2006. (Tr. 225-90).

The October 25, 2006 MRI of her cervical spine showed no lateralized disk protusions or significant disk bulging, mild uncovertebral spurring on right at C3-C4, C4-C5 and C6-C7, and mild left uncovertebral spurring at C3-C4 and C4-C5. (Tr. 297, 1269). Dr. Rodgers contacted Claimant and explained how her MRI showed degenerative changes. (Tr. 540, 550).

The October 25, 2006 MRI of her cervical spine showed no lateralized disk protrusions or significant disk bulging, mild uncovertebral spurring on right at C3-C4, C4-C5 and C6-C7, and mild left uncovertebral spurring present at C3-C4 and C4-C5. (Tr. 531, 559, 1191).

On November 6, 2006, Dr. Rodgers performed anterior cervical diskectomy, bilateral osteophytectomies, and foraminotomies, and fusion as treatment for her cervical, degenerative disk disease, disk herniations, and stenosis. (Tr. 519-30, 1179-1190,1197-1262).

Claimant returned for follow-up treatment on November 21 and December 21, 2006, and Dr. Rodgers noted she is not able to return to work yet. (Tr. 536, 548, 1166, 1168-69). She reported continued pain in top left shoulder and arm. (Tr. 537, 549)

Claimant reported having neck pain with spasms during treatment on January 12, 2007. (Tr. 166). She is not having adequate pain control taking Norco, but she feels she has done better taking two Vicodin 7.5/750 mg throughout the day. She requested a medication change. Dr. Daugherty encouraged Claimant to stop smoking. Examination showed decreased range of motion of her neck and flexion limited to ten degrees and extension five degrees. Dr. Daugherty noted Claimant has decreased range of motion of the left shoulder secondary to tendinitis/partially torn tendon in the left shoulder area. (Tr. 166). Dr. Daugherty prescribed Vicodin 7.5/750 mg one tablet every six hours without refill. (Tr. 167).

On January 25, 2007, Claimant requested an increase in her Vicodin dosage or a refill. (Tr. 165). Dr. Daugherty ordered a refill. (Tr. 165).

In the February 13, 2007, Physical Residual Functional Capacity Assessment, Dr. William Caldwell listed chronic neck pain and cervical spine discectomy as Claimant's primary diagnosis, and left shoulder partial rotator cuff tear as her secondary diagnosis. (Tr. 1381). Dr. Daugherty indicated that Claimant can occasionally lift ten pounds, frequently lift less than ten pounds, and push/pull limited in the upper extremities. Dr. Daugherty noted she could not perform repetitive reaching with her left shoulder and should not overuse her shoulder or neck can occasionally crawl but never climb ladders. (Tr. 1382). With respect to postural and communicative limitations, Dr. Daugherty found none established. (Tr. 1383, 1385). Dr. Daugherty found Claimant was limited in terms of overhead reaching and gross manipulation, but was not limited in terms of fingering or feeling. (Tr. 1384). With respect to environmental limitations, Dr. Daugherty found she should avoid machinery, driving, heights, and moving objects due to use of chronic pain medications and muscle relaxers. (Tr. 1385). She should also avoid exposure to vibrations or hazards and extreme temperatures. (Tr. 1385).

On February 15, 2007, Claimant reported her neck doing well, but she is having more and more trouble with her left shoulder. (Tr. 547). Dr. Rodgers noted how he would refer Claimant to Dr. Craighead to treat her shoulder symptoms. (Tr. 547).

The February 21, 2007 MRI of her left shoulder showed mild partial intrasubstance tear of the supraspinatus tendon but no significant tear is identified. (Tr. 555).

On March 5, 2007, Dr. Michael Snyder evaluated her left shoulder and treated her partial rotator cuff tear. (Tr. 204, 844). She reported having problems lifting or doing any extensive

activities and pain in her shoulder. Claimant reported tobacco use to be occasional. Examination of her shoulder showed positive impingement and positive Hawkins' sign. After discussing treatment options, Dr. Snyder decided to proceed with arthroscopy, arthroscopic subaromial decompression, and possible open repair of the rotator cuff. Dr. Snyder explained how the procedure will not rid her of her pain down her arm or the burning sensation in her shoulder blade inasmuch as this is coming from her neck and some permanent nerve damage. (Tr. 204, 844). On March 15, 2007, Dr. Snyder diagnosed Claimant with chronic impingement and partial rotator tear cuff tear of her left shoulder and noted she is scheduled for surgery on April 16, 2007. (Tr. 568).

Examination on April 5, 2007 showed positive impingement and positive Hawkins' sign. (Tr. 496). Dr. Snyder noted how the MRI showed evidence of impingement and a partial rotator cuff tear and how Claimant had exhausted all conservative measures of treatment and decided to proceed with arthroscopy, arthroscopic subacromial decompression, and possible open repair of the rotator cuff. Dr. Snyder explained how these procedures will not eliminate the pain down her arm and the burning in her shoulder blade or neck, because these symptoms are caused by some permanent nerve damage. (Tr. 496, 500).

On April 6, 2007, Dr. Snyder performed left shoulder arthroscopy with arthroscopic subacromial decompression as treatment of her left shoulder impingement with partial tear of the supraspinatus tendon of the rotator cuff. (Tr. 213-24, 508-09). In follow-up treatment on July 30, 2007, Claimant reported some achiness and soreness. (Tr. 487). Examination showed full passive and active range of motion, her shoulder no longer impinges, and no evidence of instability. Dr. Snyder prescribed anti-inflammatories and Vicodin, and indicated that he would

see her as needed. (Tr. 487). In follow-up treatment on April 23, 2007, Claimant reported her shoulder being a little achy and sore, and examination showed no pain with range of motion. (Tr. 495). Dr. Snyder placed her in therapy and prescribed Vicodin and ordered her to resist overhead activities. (Tr. 495).

On April 23 and 30,May 9 and 24, June 13 and 27, and July 13, 2007, Dr. Snyder's office called in refills for Vicodin. (Tr. 489-92, 498, 503).

The Impression of the July 3, 2009, radiology report of her right shoulder noted unremarkable study. (Tr. 427).

The July 7, 2009, MRI o f her right shoulder showed mild supraspinatus tendinosis without other abnormality. (Tr. 420).

On October 19, 2009, Dr. Jeffrey Magrowski, a vocational expert and rehabilitation consultant, made a vocational report on referral by Claimant's counsel. (Tr. 704). Dr. Magrowski opined that "[t]he purpose of this assessment was to evaluate her potential to compete in the open available labor market for a job...." (Tr. 704). Dr. Magrowski noted how Claimant reported trying light duty, but she could not perform it. (Tr. 709). Thereafter, she found a job as an assistant manager and then a position as a cashier, but she left the job to move to Kentucky. (Tr. 707, 709). Dr. Magrowski opined that Claimant would have returned to employment after her last neck surgery in 2007 if she could, but she has multiple injuries and reported residuals that would interfere with her ability to compete in the open labor market for a job as of 2004. (Tr. 710). He further found that her conditions were sufficient to be vocationally disabling and to constitute an obstacle to her employment and potential re-employment. Dr. Magrowski concluded that from a vocational expert standpoint, Claimant's permanent and total

vocational disability was a consequence of the cumulative effect of her multiple injuries. (Tr. 710).

On November 12, 2007, Claimant reported having chronic neck and left arm pain (Tr. 759). Dr. Kimberly Bohlmann at Marles Medical Clinic diagnosed tobacco abuse, bronchitis, GERD, and chronic neck pain and urged her to stop smoking. (Tr. 760). In follow-up treatment on November 27, 2007, Claimant reported her pain being controlled. (Tr. 761). On January 3, 2008, she reported doing well on current medications. (Tr. 762). She complained of chronic left arm pain not controlled on January 15, 2008. (Tr. 764). On February 12, 2008, Claimant reported pain being controlled. (Tr. 765).

On April 10, 2008, Claimant reported chronic neck and left shoulder pain and not controlled. (Tr. 766). Claimant reported having increased social stressors and anxiety on June 9, 2008. (Tr. 767). On July 7 and August 1, 2008, she reported feeling better and having adequate pain control. (Tr. 769, 771). On November 3, 2008, Claimant reported feeling good and pain controlled. (Tr. 774). On March 31, 2009, she returned for a medication refill and requested a muscle relaxer but indicated otherwise her pain control is adequate. (Tr. 776). Examination on June 26, 2009 showed generalized tenderness to palpation of the right shoulder with some decreased range of motion. (Tr. 778). Dr. Bohlmann injected her shoulder with Lidocaine and Medrol, and she had instant improvement with her pain. (Tr. 778). On September 11, 2009, Claimant reported right posterior rib pain status post a fall and working on smoking cessation. (Tr. 781). In follow-up treatment on January 19, 2010, Claimant reported "somebody working for her disability felt that it would be helpful for her case if she required a scooter. She admits she doesn't have any problems walking several miles." (Tr. 784). She claimed her daughter-in-

law stole her medications, and Dr. Bohlmann explained that she is only able to refill medications when due. (Tr. 784).

In follow-up treatment on April 30, 2010, Claimant returned reporting she was not happy with the care she received at the Free Clinic so she returned to Marles Medical Clinic. (Tr. 785). She reported having her medications stolen last month. She has temporary custody of two grandchildren and experiencing increased stress from serving a child care provider. Dr. Bohlmann once again explained that if her medications are stolen, they cannot be replaced early. (Tr. 785).

## IV. The ALJ's Decision

The ALJ found Claimant meets the insured status requirements of the Social Security Act through December 31, 2009. (Tr. 18). The ALJ found that Claimant has not engaged in substantial gainful activity since June 30, 2004, the alleged onset date. (Tr. 18). The ALJ found that since the alleged onset date, the medical evidence establishes that Claimant has the impairments of degenerative disc disease of the cervical spine, residuals of left carpal tunnel surgery, and impingement of the left shoulder with later residuals of left shoulder surgery in April 2007, but no impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 18-21). Next, the ALJ found that prior to April 6, 2007, the date she underwent left shoulder surgery and the date the ALJ found she became disabled, Claimant had the residual functional capacity to perform sedentary work except she could only occasionally and frequently lift and/or carry less than ten pounds of weight, had to avoid repetitive reaching in all directions on the left, could not reach overhead more than occasionally on the left, had to avoid repetitive handling/gross manipulation of objects

on the left, had to avoid even moderate exposure to extremely hot and cold temperatures, and avoid all exposure to vibrations and the hazards of unprotected heights and dangerous/moving machinery. (Tr. 21). The ALJ found that beginning on April 6, 2007, and since then and up to the date of the decision, Claimant has had the residual functional capacity to perform less than a full range of sedentary work, because her symptoms and side effects from medication are so severe as to preclude Claimant from sustaining an ordinary routine on a regular and consistent basis due to severe grogginess and stomach upset causing inability to maintain adequate concentration and persistence on work tasks and due to the need to lie down frequently throughout the day for relief of symptoms. (Tr. 24).

The ALJ found that since June 30, 2004, Claimant has been unable to perform any past relevant work. (Tr. 25). Prior to the established disability onset date, Claimant was a younger individual age 45-49 with at least a high school education and is able to communicate in English. Next, the ALJ found prior to April 6, 2007, transferability of job skills is not material to the determination of disability, because using the Medical-Vocational Rules as a framework a finding that Claimant is not disabled whether or not she has transferable job skills but beginning on April 6, 2007, she had not been able to transfer job skills to other occupations. The ALJ found prior to April 6, 2007, considering her age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that she could have performed. (Tr. 25). Next, the ALJ found that beginning on April 6, 2007, considering Claimant's age, education, work experience, and residual functional capacity, there are no jobs in significant numbers that she can perform. (Tr. 26). Finally, the ALJ concluded Claimant was not disabled prior to April 6, 2007, but she became disabled on that date and has

continued to be disabled through the date of his decision.  (Tr. 26).

**V.    Discussion**

In a  disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); <u>see</u> <u>also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled.  First, the ALJ must determine whether the individual is engaged in "substantial gainful activity."  If she is, then she is not eligible for disability benefits.  20 C.F.R. § 404. 1520(b).  If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant is not found to have a severe impairment, she is not eligible for disability benefits.  If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the

Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-42 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.      The credibility findings made by the ALJ.

2.      The claimant's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The claimant's subjective complaints relating to
        exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the
        claimant's impairments.

6.      The testimony of vocational experts when required which
        is based upon a proper hypothetical question which sets forth the claimant's
        impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

        The ALJ's decision whether a person is disabled under the standards set forth above is

conclusive upon this Court "if it is supported by substantial evidence on the record as a whole."

Wiese , 552 F.3d at 730 (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008).

"Substantial evidence is less than a preponderance but is enough that a reasonable mind would

find it adequate to support the conclusion."  Wiese, 552 F.3d at 730 (quoting Eichelberger v.

Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)).  When reviewing the record to determine whether

the Commissioner's decision is supported by substantial evidence, however, the Court must

consider evidence that supports the decision and evidence that fairly detracts from that decision.

Id.  The Court may not reverse that decision merely because substantial evidence would also

support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001), or it

might have "come to a different conclusion." Wiese, 552 F.3d at 730.  Thus, if "it is possible to

draw two inconsistent positions from the evidence and one of those positions represents the

agency's findings, the [Court] must affirm the agency's decision." Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000). See also Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

Claimant contends that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ's credibility analysis is flawed. Claimant argues the ALJ's credibility analysis was insufficient because the ALJ failed to consider her testimony regarding why she stopped working, and her lack of insurance and limited medical treatment. Defendant responds that the ALJ properly considered the objective evidence, treatment history, and the medical opinion evidence in determining Claimant's credibility.

"[A]n ALJ may not discount a claimant's subjective complaints solely because the objective medical evidence does not fully support them" Wiese v. Astrue, 552 F.3d 728, 733 (8th Cir. 2009). When evaluating the credibility of a claimant's subjective complaints, the ALJ must consider several factors: "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009) (citing Polaski v. Heckler, 739 F.3d 1320, 1322 (8th Cir. 1984)). "An ALJ who rejects subjective complaints must make an express credibility determination explaining the reason for discrediting the complaints." Moore, 572 F.3d at 524 (quoting Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000)). However, the ALJ need not explicitly discuss each factor. Id, (citing Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005)).

In his decision the ALJ thoroughly discussed the paucity of the medical evidence of record and gap in treatment, her reason for stopping work, and her worker's compensation cases. See Gray v. Apfel, 192 F.3d 799, 803-04 (8th Cir. 1999) (ALJ properly discredited claimant's subjective complaints of pain based on discrepancy between complaints and medical evidence, inconsistent statements, lack of pain medications, and extensive daily activities). The ALJ then addressed several inconsistencies in the record to support his conclusion that Claimant's complaints were not credible.

With respect to why Claimant stopped working, the ALJ opined as follows:

"[f]irst and foremost on the issue of credibility, the undersigned notes that, despite all of her complaints of back and shoulder/arm pain and her multiple worker's compensation claims (a total of six claims in all, according to claimant's attorney), the claimant continued to work until June 2004 when she left her job to move to another state. The claimant testified at the hearing that she continued to work as a clerk/grill cook until she moved to her new residence in June 2004. It appears that claimant's relocation is the primary reason she quit working at that time rather than any medical complaints. These circumstances significantly weaken the credibility of the alleged severity of her complaints at that time.

(Tr. 23).

The undersigned notes that the record shows Claimant worked at Mr. GS Deli until she moved to Ohio, and she did not quit that job before moving because of her alleged disabling impairments. See McCoy v. Astrue, 648 F.3d 605, 614 (8th Cir. 2011) (inconsistencies in the record detract from a claimant's credibility). Nonetheless, at the hearing, Claimant testified that she stopped working because she could no longer lift the chicken or run the meat slicer, and she has not looked for work since leaving Mr. GS Deli. During a rehabilitation consultation, Dr. Magrowski noted how Claimant left her cashier job to move to Kentucky and then she reported

working at Mr. G's as a short order cook with accommodations. (Tr. 707, 709). The undersigned finds the record supports the ALJ's finding that Claimant's primary reason she quit working was her relocation rather than her medical complaints. The Eighth Circuit has found it significant when a claimant leaves work for reasons other than disability. Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005)(claimant stopped working after being fired, not because of her disability); Kelley v. Barnhart, 372 F.3d 958, 961 (8th Cir. 2004) (claimant's leaving work for reasons unrelated to medical condition detracted from credibility); Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003) (claimant left his job because the job ended; therefore, not unreasonable for the ALJ to find that this suggested that his impairments were not as severe as he alleged); Weber v. Barnhart, 348 F.3d 723, 725 (8th Cir. 2003) (noting that claimant left her job due to lack of transportation, not due to disability). The undersigned finds that the ALJ properly considered how Claimant continued to work until June 2004 when she left her job and moved to another state and that his decision is supported by substantial evidence.

Specifically, the ALJ noted that no treating or consultative physician in any treatment notes stated that Claimant was disabled or unable to work or imposed significant long-term physical and/or mental limitations on Claimant's capacity for work during the relevant time period. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective complaints). The lack of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints. See Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir.

1995)(lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994)(the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints). Although the ALJ is incorrect in his finding Claimant did not seek any treatment for her complaints until November 2004, the record shows she went to the emergency room in September 2004 complaining of severe muscle spasms in her back, not of neck and shoulder pain. In the August 2004 evaluation at the request of counsel, Dr. Umbright did not opine that she was totally and permanently disabled until December 1, 2007.

In support of his credibility findings, the ALJ noted that no physician who examined Claimant found her to have limitations consistent with disability. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) ("We find it significant that no physician who examined [claimant] submitted a medical conclusion that she is disabled and unable to perform any type of work."). The lack of medical evidence supporting Claimant's complaints was a proper consideration when evaluating her credibility, see Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006), as was her failure to pursue more aggressive treatment. See Tate v. Apfel, 167 F.3d 1191, 1197 (8th Cir. 1999). In addition, the ALJ noted that no physician had ever made any medically necessary restrictions, restrictions on her daily activities, or functional limitations. Brown v. Chater, 87 F.3d 963, 964-65 (8th Cir. 1996) (lack of significant medical restrictions imposed by treating physicians supported the ALJ's decision of no disability). Likewise, the ALJ noted how the medical record is devoid of any evidence showing that Claimant's condition has deteriorated or required aggressive medical treatment. Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir.

1995) (failure to seek aggressive medical care is not suggestive of disabling pain); Walker v. Shalala, 993 F.2d 630, 631-32 (8th Cir. 1993)( lack of ongoing treatment is inconsistent with complaints of disabling condition).

Moreover, as noted by the ALJ, Claimant received little medical treatment until 2006. From August 1, 2004 until August 9, 2004, there is no record of Claimant seeking any care for impairment, and another gap in treatment from November 11, 2004 to March 18, 2005. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) (failure to seek medical care was inconsistent with claimant's contention that she was disabled); Hughes v. Astrue, 2008 WL 621078, at *6 (E.D. Ark. Mar. 3, 2008) (where there are gaps of six and eight months between claimant's attempts to seek medical care for his conditions, ALJ was permitted to discount claimant's complaints of disabling pain).

Although Claimant argues in her Brief she could not afford more frequent medical treatment and testings due to lack of finances and insurance before June 2006, the record is devoid of any evidence suggesting that Claimant sought any treatment offered to indigents. See Nelson v. Sullivan, 966 F.2d 363, 367 (8th Cir. 1992)(holding the mere use of nonprescription pain medication is inconsistent with complaints of disabling pain); Murphy v. Sullivan, 953 F.2d 383, 386-87 (8th Cir. 1992)(finding it is inconsistent with the degree of pain and disability asserted where no evidence exists that claimant attempted to find any low cost medical treatment for alleged pain and disability). Insofar as this may be construed as an explanation for her not seeking any treatment during the relevant period, it is unavailing. The record does not document that Claimant was ever refused treatment or medication because a lack of funds, and no evidence that she attempted to obtain low cost treatment or mediation and was rebuffed. See Osborne v.

Barnhart, 316 F.3d 809, 812 (8th Cir. 2003) (recognizing that a lack of funds may justify a failure to receive medical care; however, a plaintiff's case is buttressed by evidence he related of an inability to afford prescriptions and denial of the medication). Before a lack of funds may excuse a failure to pursue treatment or obtain medication, there must be evidence that the claimant was denied medical treatment due to financial reasons. Goff, 421 F.3d at 793. See also Murphy, 953 F.2d at 386-87 (rejecting claim of financial hardship in case in which there was no evidence that claimant had attempted to obtain low cost medical treatment or had been denied care because of inability to pay). Here, the record is devoid of any credible evidence showing that Claimant was denied treatment due to lack of finances. Likewise, the record is devoid of any evidence showing that Claimant had been denied medical treatment or access to prescription pain medications on account of financial constraints. See Clark v. Shalala, 28 F.3d 828, 831 n.4 (8th Cir. 1994).

The ALJ also considered that Claimant appeared motivated to qualify for disability benefits. Upon reaching this conclusion, the ALJ considered that "claimant has had workers' compensation cases pending for over a decade and could be less motivated to recover enough to return to some form of work." (Tr. 23). The Eighth Circuit has held that an ALJ may discount a claimant's subjective complaints for, among other reasons, that he appeared to be motivated to qualify for disability benefits. Eichelberger, 390 F.3d at 590 (holding that although the ALJ found that the claimant had objectively determinable impairments, the ALJ properly considered that the claimant's incentive to work might be inhibited by her long-term disability check of $1,700 per month); Gaddis v. Chater, 76 F.3d 893, 896 (8th Cir. 1996) (holding that the ALJ to judge properly considered a strong element of secondary gain upon discrediting the claimant).

Here, this was just one factor that the ALJ considered, and the record does not indicate that the ALJ gave undue weight to this factor. The undersigned finds that the ALJ properly considered Claimant's motivation to qualify for benefits and that his decision is supported by substantial evidence.

Further, the undersigned notes that Claimant continued to smoke cigarettes despite repeatedly being encouraged to stop. A lack of desire to improve one's ailments by failing to follow suggested medical advice detracts from a claimant's credibility. See Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001) (claimant's failure to follow prescribed course of treatment weighed against credibility when assessing subjective complaints of pain);Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir. 1989) (holding that an ALJ can discredit subjective complaints of pain based on claimant's failure to follow a prescribed course of treatment). Additionally, subjective complaints of pain may be discredited where a claimant ceases to stop smoking upon a doctor's advice. See Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006) ("[A]n ALJ may properly consider the claimant's noncompliance with a treating physician's directions, including failing to take prescription medications, seek treatment, and quit smoking."); Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 1996) (citing Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997) (holding impairments which are controllable or amenable to treatment do not support a finding of disability, and failure to follow a prescribed course of remedial treatment, including cessation of smoking, without good reason is grounds for denying an application of benefits). Therefore, Claimant's failure to cease smoking detracts from her claim that she was unable to engage in substantial gainful employment during the relevant time period.

As demonstrated above, a review of the ALJ's decision shows the ALJ not to have denied

relief solely on the lack of objective medical evidence to support his finding that Claimant is not disabled. Instead, the ALJ considered all the evidence relating to Claimant's subjective complaints, including the various factors as required by Polaski, and determined Claimant's allegations not to be credible. Although the ALJ did not explicitly discuss each Polaski factor in making his credibility determination, a reading of the decision in its entirety shows the ALJ to have acknowledged and considered the factors before discounting Claimant's subjective complaints. See Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). Inasmuch as the ALJ expressly considered Claimant's credibility and noted numerous inconsistencies in the record as a whole, and the ALJ's determination is supported by substantial evidence, such determination should not be disturbed by this Court. Id.; Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996). Because the ALJ gave multiple valid reasons for finding Claimant's subjective complaints not entirely credible, the undersigned defers to the ALJ's credibility findings. See Guilliams v. Barnhart, 393 F.3d 798, 801(8th Cir. 2005).

The undersigned finds that the ALJ considered Claimant's subjective complaints on the basis of the entire record before him and set out the inconsistencies detracting from Claimant's credibility. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ pointed out inconsistencies in the record that tended to militate against the Claimant's credibility. See Guilliams, 393 F.3d at 801 (deference to ALJ's credibility determination is warranted if it is supported by good reasons and substantial evidence). Those included the paucity of the medical evidence of record and gap in treatment, her reason for stopping work, and her worker's compensation cases. The ALJ's credibility determination is supported by substantial evidence on

the record as a whole, and thus the Court is bound by the ALJ's determination.  <u>See</u> <u>Cox v.</u> <u>Barnhart</u>, 471 F.3d 902, 907 (8th Cir. 2006); <u>Robinson v. Sullivan</u>, 956 F.2d 836, 841 (8th Cir. 1992).

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. An ALJ's decision is not to be disturbed "'so long as the ... decision falls within the available zone of choice.  An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'" <u>Buckner v. Astrue</u>, 646 F.3d 549, 556 (8th Cir. 2011) (quoting <u>Bradley v.</u> <u>Astrue</u>, 528 F.3d 1113, 1115 (8th Cir. 2008)).  Although Claimant articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above. Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that  the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have fourteen  (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  <u>See</u> <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this <u>3rd</u> day of July, 2014.